UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALLSTATE INSURANCE COMPANY,_

              Plaintiff,

vs.                                        Case No. 3:24-cv-479-jdp

DEANNA FREEMAN,

              Defendant.

---

## DEFENDANT'S BRIEF IN SUPPORT OF DEFENDANT'S RULE 11 MOTION FOR SANCTIONS

---

Dated November 11, 2025.            Respectfully submitted,

                                      /s/ Robert B. Corris

                                      _____

                                      Robert B. Corris
                                      Wisconsin Bar. No. 1013438
                                      Attorney for Defendant

ROBERT B. CORRIS, S.C.
W309 N6399 Lakeview Lane
Hartland WI 53029
Cell: 414-573-8000
E-mail: rcorris@corrislaw.com

Defendant Deanna Freeman moves for sanctions against the Plaintiff Allstate Insurance Company pursuant to Fed. R. Civ. P. 11 ("Rule 11") for filing or continuing frivolous claims in violation of Rules 11(b)(2) and 11(b)(3). The tragedy of this case is that, Javert-like, Allstate has relentlessly pursued Freeman, in spite of her having loyally honored her covenant of confidentiality by regularly shredding her notes and, after she resigned, by waiting for customers – almost entirely friends and family – to contact her. Freeman has incurred more than $100,000 in fees and costs to defend herself from Allstate's frivolous claims, and Allstate should be ordered to pay Freeman's attorneys' fees and expenses as a sanction for violating Rule 11.

The gravamen of Allstate's Complaint is that "while working for EA Beaulieu, Freeman kept records of Allstate confidential information, including customer names, contact information, and policy information, in personal planner notebooks ("notebooks") and that when Freeman's Agreement terminated, Freeman did not return the notebooks. Upon information and belief, Freeman also did not destroy the notebooks." Complaint, ¶ 8. Allstate alleges that instead, upon information and belief, Freeman kept the notebooks and used (and is using) the confidential Allstate customer information in the notebooks to solicit Allstate customers and improperly compete with Allstate. Complaint, ¶ 9. Allstate alleges that its Confidential Information constitute trade secrets. Complaint ¶¶ 101-103.

Allstate has no evidence to support these allegations. Allstate's claims are based on the speculation of the two owners of its Oshkosh agency, Brett A. Beaulieu LLC ("Beaulieu Agency"). Allstate does not know what information Freeman wrote down in her notes, because Freeman regularly tore her notes out of her notebooks and then shredded them. In her Initial Disclosures dated October 10, 2024, Freeman disclosed that employees or former employees of the Beaulieu Agency would know about Defendant's practice of tearing up pages from her planners. Corris

Decl. ISO Motion for Rule 11 Sanctions, Exh. A. In a supplemental disclosure on December 11, 2024, Freeman produced a declaration from one of those employees, LeeAnn Ackley, who stated on penalty of perjury that she personally saw that Deanna Freeman had a cardboard box by her desk, saw Freeman put papers into the cardboard box to be shredded, and saw Freeman tear the papers into small pieces before Freeman put them into the cardboard box. She and other employees used to joke about Freeman tearing up papers that were going to be shredded anyway; and she also personally saw Freeman take her cardboard box to the Shred-It bin on many occasions. Corris Decl. ISO Motion for Rule 11 Sanctions, Exh. B[1].

Freeman deposed Brett Beaulieu, testifying as a corporate representative of the Beaulieu Agency on January 15, 2025. Beaulieu Jodi Newell, another Beaulieu employee, as someone who might have seen what, if anything, was written in a notebook or planner that Freeman had at the office in May 2023 ("I can speculate Jodi Newell could have; but, again, it's speculation." Document 29, and Document 35, ¶ 79). Newell was employed both before and after Freeman's employment with the Beaulieu Agency. Allstate never investigated Newell's knowledge. Newell has declared under penalty of perjury that on regular basis she would pick up Freeman's container and take it to the shredder. Document 29 and Document 35, ¶ 46.

Freeman deposed Dawn Beaulieu on April 30, 2025. Ms. Beaulieu admitted that she had no personal knowledge that Freeman took or had possession of any of Allstate's Confidential Information when she left the Beaulieu Agency. Ms. Beaulieu admitted she had no personal knowledge that Freeman had kept her notes. The frivolousness with which Allstate has pursued this case is highlighted by the fact that Allstate denied a series of Requests for Admission by

---

[1] Ackley signed a later declaration that corrected one date and that provided additional detail about the events when the Beaulieu Agency moved its Oshkosh offices from Algoma Blvd to Jackson Street. Ackley saw Freeman remove wire spirals from her notebooks and throw the notebooks into containers that the shredding service was taking away to be shredded. Document 28, ¶ 10.

identifying Ms. Beaulieu as a person having personal knowledge of the facts supporting its denials, even though Ms. Beaulieu repeatedly denied having any such personal knowledge in her deposition. See the Declaration of Robert B. Corris in Support of Defendant's Rule 11 Motion, Exhibits D, E, F, and G, which set forth Allstate's responses to a number of Requests for Admission, excerpts from Dawn Beaulieu's deposition and excerpts from the Beaulieu Agency 30(b)(6) deposition.

**ARGUMENT**

**I.    STANDARDS FOR RULE 11 MOTIONS.**

Rule 11(b) provides:

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Rule 11(c)(1) provides:

**(1)  *In General.*** If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

While Rule 11(c)(5) provides that a court may not award a monetary sanction against a represented party for a violation of Rule 11(b)(2), no such limitation applies to a sanction against a party for violating Rule 11(b)(3).

3

Rule 11 authorizes a district court to impose sanctions on lawyers or parties (or both) for submissions that are filed without a reasonable investigation of the facts and law necessary to support their claims. Senese v. Chicago Area I.B. of T. Pension Fund, 237 F. 3d 819 (7th Cir. 2001). In Upchurch v. O'Brien, 19-CV-165-WMC, 2021 WL 3617098 (W.D. Wis. Aug. 16, 2021), the court imposed sanctions on the plaintiff and its counsel for violating Rule 11(b)(3). The court cited Fries v. Helsper, 146 F.3d 452, 458 (7th Cir. 1998) for the proposition that a frivolous contention, including one "that is baseless and made without a reasonable and competent inquiry," is subject to Rule 11 sanctions. The Upchurch court found that both the client and the attorney violated Rule 11(b)(3) when they failed to reasonably certify that the factual contentions in the complaint had, or after reasonable opportunity for investigation were likely to have, evidentiary support. Upchurch, 2021 WL 3617098 *8.

Rule 11 "requires that the district court undertake an objective inquiry into whether the party or his counsel 'should have known that [a] position is groundless.'" Dist. No. 8, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Clearing, a Div. of U.S. Indus., Inc., 807 F.2d 618, 622 (7th Cir. 1986) (quoting Coleman v. Comm'r, 791 F.2d 68, 71 (7th Cir. 1986)). The rule does not require a showing of bad faith. Id. Instead, the rule "is principally designed to prevent baseless filings." Brunt v. Serv. Emps. Int'l Union, 284 F.3d 715, 721 (7th Cir. 2002).

"Rule 11 requires attorneys to certify that every court filing advances arguments warranted by existing law or a nonfrivolous argument for extending the law. Fed. R. Civ. P. 11(b)(2). Similarly, the factual contentions attorneys advance must have evidentiary support or be likely to have evidentiary support after a reasonable opportunity for further investigation. *Id.* at 11(b)(3)." McGreal v. Vill. of Orland Park, 928 F.3d 556, 558-559 (7th Cir. 2019). Both Rule 11(b)(2) and (b)(3) are evaluated objectively. Rule 11 requires counsel to study the law before representing its

4

contents to a federal court. "An empty head but a pure heart is no defense." *Id*., citing <u>Thornton v. Wahl</u>, 787 F.2d 1151, 1154 (7th Cir. 1986).  If an attorney fails to comply with these professional requirements, Rule 11 allows for sanctions.

With respect to Rule 11(b)(2), every lawyer must do the necessary work to find the law **before** filing. It is not acceptable to make an assertion of law and hope that it will turn out to be true. <u>Thornton v. Wahl</u>, 787 F.2d at 1154. In determining whether the attorney made a reasonable inquiry into the law, consideration should include the amount of time the attorney had to prepare the document and research the relevant law; whether the document contained a plausible view of the law; the complexity of the legal questions involved; and whether the document was a good faith effort to extend or modify the law. <u>Brown v. Federation of State Medical Boards of U.S.</u>, 830 F.2d 1429, 1435 (7th Cir. 1987) (citations omitted), *abrogated on other grounds,* <u>Mars Steel Corp. v. Continental Bank, N.A.</u>, 880 F.2d 928 (7th Cir.1989).

With respect to Rule 11(b)(3), the district court applies an objective standard when determining whether an attorney made a reasonable inquiry into the facts of a case.  The district court should consider whether the signer of the documents had sufficient time for investigation; the extent to which the attorney had to rely on his or her client for the factual foundation underlying the pleading, motion, or other paper; whether the case was accepted from another attorney; the complexity of the facts and the attorney's ability to do a sufficient pre-filing investigation; and whether discovery would have been beneficial to the development of the underlying facts. <u>Brown</u>, 830 F.2d at 1435.

Here, Allstate did not file this lawsuit until July 15, 2024. (Document 1). Freeman's last day of employment was July 28, 2023  (See Corris Decl., Exh. F, at 33 of 35 [124:12-17]).  Despite having almost a year to investigate its claims, Allstate did not interview Freeman's co-workers or

ask their former customers whether Freeman had solicited them.  Instead, Allstate relied on Brett and Dawn Beaulieu, both of whom admitted that they lacked personal knowledge and were speculating.

Freeman satisfied her safe harbor obligations by serving a draft motion, brief, and declaration on May 5, 2025.  On May 29, 2025, Allstate denied violating Rule 11.  Allstate has not withdrawn any of its claims.  This brief has been edited to reduce length and substantively differs from Freeman's draft brief only by addressing the frivolousness of arguments made or cases cited in Allstate's response to Freeman's motion for summary judgment, filed before the safe harbor period had expired.

## II.    ALLSTATE HAS VIOLATED RULE 11(b)(3) AND SHOULD BE SANCTIONED PURSUANT TO RULE 11(c)(1) BECAUSE ALLSTATE COMMENCED AND HAS CONTINUED ITS TWO CLAIMS FOR MISAPPROPRIATION OF TRADE SECRETS[2] WITHOUT ANY SPECIFIC IDENTIFICATION OF THE TRADE SECRETS ALLEGEDLY MISAPPROPRIATED, WITHOUT ACTUAL KNOWLEDGE OF ANY MISAPROPRIATION, AND WITHOUT ANY FACTS OTHER THAN SPECULATION.

This is not a case where an employer claims its departing employee took electronically stored information ("ESI") or copied a database. Allstate has not alleged that Freeman took ESI from its database. Allstate has not produced any report or evidence that Freeman downloaded, copied, exported, or e-mailed to herself any alleged trade secret. Allstate has not named any expert witness offering any opinion or produced any report that Freeman misappropriated information from Allstate's database.

### A.    Allstate cannot specifically identify what trade secrets Freeman allegedly misappropriated.

A plaintiff alleging trade secret misappropriation must identify specific documents or information that constitute trade secrets, not simply list categories or general topics of information.

---

[2] Count II alleges violation of the Wisconsin Uniform Trade Secrets Act and Count III alleges violation of the federal Defend Trade Secrets Act.

Kuryakyn Holdings, LLC v. Ciro, LLC, 242 F. Supp. 3d 789, 800 (W.D. Wis. 2017), Marine Travelift, Inc. v. Marine Lift Sys., Inc., No. 10-C-1046, 2013 WL 6255689,*6 (E.D. Wis. Dec. 4, 2013). A plaintiff must identify its purported trade secret with "a high level of specificity." REXA, Inc. v. Chester, 42 F.4th 652, 663 (7th Cir. 2022).  A plaintiff cannot escape its burden of proof with a conclusory statement that 'everything' is a trade secret." DF Inst., LLC v. Dalton Educ., LLC, 19-CV-452-JDP, 2020 WL 4597122, at *5 (W.D. Wis. Aug. 11, 2020) (citing Vojdani v. Kellerman, 10-cv-37-bbc, slip op., at 2 (W.D. Wis. Jan. 11, 2011)).

Even before demonstrating the statutory elements of misappropriation, a plaintiff must first identify with specificity the trade secrets it accuses the defendant of misappropriating. Marine Travelift,, 2013 WL 6255689, at *5, IDX Sys. Corp. v. EPIC Sys. Corp., 285 F.3d 581, 583 (7th Cir.2002). It is not enough for a plaintiff to assert that among the information the defendant had access to are various trade secrets and then leave it to a jury to decide which items of information were disclosed and whether they fit the statutory definition of a trade secret Marine Travelift *5. A defendant should not have to guess what information the plaintiff claims was disclosed and see for the first time at trial the evidence the plaintiff has to prove it fits the definition of a trade secret. Id.

In Weather Shield Mfg., Inc. v. Drost, No. 17-cv-294-jdp, 2018 WL 3824150 (W.D. Wis. Aug. 10, 2018), the Court denied the employer's motion for summary judgment because, among other reasons, the employer had not identified what specific information constituted its trade secrets.  The Court said:

> Furthermore, it is not enough to claim that the documents fall into broad categories of confidential information. The party claiming trade secrets protection must identify the specific information that it alleges contains trade secrets, and then show that the identified information is valuable because it is not generally known and cannot be readily ascertained by proper means. (citing IDX, 285 F.3d at 583). Weather Shield has not met this burden. Several of its identified trade secrets—such as "internal meeting notes"—are too vague for

the court to determine if they meet the statutory definition. Dkt. 107, at 5. Weather Shield elaborates upon this description in its proposed findings, but the longer description is no more specific: "meeting notes that highlight next steps and persons responsible for certain Weather Shield's strategic initiatives." Dkt. 108, ¶ 167(e). It is Weather Shield's responsibility, not the court's, to pin down the specific information that Weather Shield considers a trade secret. (citing IDX, 285 F.3d at 583).

Here, Allstate claims that its trade secrets are notes Freeman made while speaking on the telephone with customers or making "to do" lists. Yet Allstate has not identified what specific information in any of Freeman's notes or to do lists meets the definition of a trade secret. Nor can it. Allstate did not have any of its own employees on site at the Beaulieu Agency to see what was on the notes Freeman was making. Document 35, ¶ 60. Brett Beaulieu admitted that he and his wife did not look in Freeman's notebooks. Document 35, ¶¶ 56-59. Dawn Beaulieu likewise denies knowledge of the specific content of Freeman's notes or whether she took or kept any of Allstate's Confidential Information when she left. See Corris Decl., Exh. F. In other words, neither Allstate, nor Brett Beaulieu, nor Dawn Beaulieu can testify from personal knowledge what Freeman actually wrote down, much less what specific information that she wrote down would constitute trade secrets of Allstate. Allstate knew that it could not identify any specific trade secrets in Freeman's notes when it filed and continued this lawsuit.

There are good reasons why Allstate cannot identify what trade secrets, if any, were written in Freeman's notebooks. First, no one from Allstate or Beaulieu Agency looked. Second, Freeman regularly tore out the pages with her notes and shredded them. Third, as part of her Initial Disclosures, Freeman produced the notebooks she has, and aside from a few pages with her family's personal information, the notebooks consist only of blank pages.

Allstate relies solely on the speculation of the two owners of the Beaulieu Agency, Brett and Dawn Beaulieu. Reduced to its essence, Dawn Beaulieu testified that there were some occasions when Deanna Freeman was alone in the Beaulieu Agency's Oshkosh office or when she

was working from home. However, Ms. Beaulieu has no personal knowledge that on any of those

occasions Freeman misappropriated anything.  She admits that she would be speculating:

```
2    Q   Well, you don't know -- if she took papers home
3        you don't know that she left any of those papers
4        home, do you?
5    A   No.
6    Q   You didn't know it when -- before this lawsuit was
7        started, true?
8    A   Correct.
9    Q   You didn't know it -- and you don't know it today,
10       true?
11   A   Correct.
12   Q   So any suggestion that you're stating that Deanna
13       could have taken papers home and left them, you're
14       speculating, correct?
15   A   Correct.
```

    Dawn Beaulieu dep. 119:2-15.

Likewise, Ms. Beaulieu admitted that she would be speculating that while Freeman was at the

office, she printed out reports and took them home:

```
5    Q   And when you say -- when you were talking about
6        those six to ten e-mails that had customer lists
7        attached and you were asked [by Allstate's counsel] could Deanna have
8        printed them, you would be speculating as to
9        whether or not she had printed any of those
10       reports, true?
11   A   Correct.
12   Q   And you would be speculating as to whether or not
13       she asked Jodi Newell to print any reported,
14       correct?
15   A   Correct.
16   Q   And when you were asked whether she could have
17       taken them home you would be speculating that he (sic)
18       took any of those reports home, correct?
19   A   Correct.
```

    Dawn Beaulieu dep. 121:5-19.

Ms. Beaulieu also admitted that neither the Beaulieu Agency nor Allstate had any tech-savvy

person come in and look at Freeman's or Newell's computer or the printers in the Oshkosh office

to see what electronic records showed about printing any documents. Dawn Beaulieu dep. 123:4 - 124:1.

After Freeman provided Allstate with her safe harbor draft motion, brief and supporting documents, Allstate responded by referring to paragraph 28 of its Complaint (Dkt. 1) and claimed that its trade secrets "are its customer contact information, types of policies, amount of insurance, premium amounts, description and location of assets and property, claims histories, insurance needs, pricing information, and other insurance coverage information." This overbroad description does not pass muster at the summary judgment stage.

Sufficient notice in the Complaint, is not sufficient at summary judgment. See <u>Brady Corp. v. Wood, No. 24-CV-265-JPS, 2024 WL 5398591 (E.D. Wis. Dec. 2, 2024).</u> At the summary judgment stage, a plaintiff must identify its purported trade secret with "a high level of specificity." <u>REXA</u>, 42 F.4th at 663, <u>IDX,</u> 285 F.3d at 583,  <u>Kuryakyn,</u> 242 F. Supp. 3d at 800, <u>Marine Travelift,</u> 2013 WL 6255689, *6, <u>Weather Shield</u>, 2018 WL 3824150, *2. Here, Allstate has failed to specifically identify what trade secrets Freeman allegedly misappropriated.

Allstate's citation to one of its own cases – in which it was represented by the same law firm and lead attorney who appear here – demonstrates that Allstate's position here is frivolous. Faced with unrebutted evidence that Freeman or her co-workers regularly shredded the notes that Allstate alleges she took, without any evidence of what information Freeman had jotted down on any occasion when she made notes, and with no evidence that she kept any of her notes, Allstate offers database cases – wholly inapplicable to the facts of this case -- to identify its trade secrets.[3]

---

[3] In addition to the Ameriprise cases discussed in the text of this brief, Allstate cites the following compilation cases: <u>Am. Family Ins. Co. v. Roth</u>, 485 F.3d 930 (7th Cir. 2007) (1847 names in customer list, majority in database); <u>Duggan v. A. Fam. Mut. Ins. Co.</u> 07-C-212, 2010 WL 1268175 (E.D. Wis. Mar. 30, 2016) (logs showed numerous inquiries into database system before termination, employees began entering information into newly created database for benefit of new agencies); <u>Ziegler v. Allstate Ins. Co.</u>, No. 16-CV 869, 2018 WL 1184738 (N.D. Ill. Mar. 7, 2018) (downloading

In <u>Allstate Ins. Co. v. Ameriprise Fin. Services, Inc.</u>, 17-cv-5826, 2023 WL 5334638, N.D. Ill. Aug. 18, 2023), Allstate disclaimed trade secret protection for individual insured's information. The court states, "Plaintiffs allege **that this compilation of data, rather than the data individually,** warrants trade secret protection…[I]t is the compilation of this information in Allstate proprietary and protected databases that makes the information as a whole valuable to a competitor like Ameriprise and worthy of trade secret protection." Id. at *8-9 (emphasis added). This allegation by Allstate is a damning admission, because he instant case is not a compilation case.

Notwithstanding the undisputed evidence that Freeman or co-workers shredded Freeman's notes, Allstate alleges that various of her notes – the contents of which are unknown -- made by her during phone calls with individual insureds contain trade secret information.  Allstate's citation to database cases does not save it from a Rule 11 sanction because this is not a database compilation case. Rather, it is a case where an employee tried to do everything right by shredding her notes, and nevertheless Allstate sued her for misappropriating  unspecified trade secrets on the very notes she shredded. The database compilation cases were obviously inapplicable and citing them was frivolous, because Allstate's contradictory position in <u>Ameriprise</u> predates the instant case. Allstate has frivolously subjected Freeman to more than a hundred thousand dollars in fees and costs to defend herself, See the Declaration of Robert B. Corris in Support of Defendant's Motion for Rule 11 Sanctions, ¶ 1, without identifying with the required specificity what trade secrets she allegedly misappropriated and without any proof that she misappropriated anything.

**B.    Allstate has violated Rule 11(b)(3) because any reasonable investigation would have disclosed that Freeman regularly shredded the pages from her notebooks**

---

or printing from database); <u>Allstate Ins. Co. v. Fougere</u>, 79 F.4th 172 (1st Cir. 2023) ( compilation of thousands of Allstate customers)).

**on which she made notes.  Instead Allstate relied solely on speculation to allege and pursue its claims for misappropriation of trade secrets.**

Even if Allstate had sufficiently identified the purported trade secrets that it alleges Freeman has misappropriated – it has not –Allstate has pursued this case without any facts that Freeman in fact misappropriated any of such purported trade secrets. Under the Defend Trade Secrets Act and the Wisconsin Uniform Trade Secrets Act, Allstate must prove misappropriation showing either "unauthorized acquisition, disclosure or use of a trade secret. " J.S.T. Corp. v. Foxxconn Interconnect tech. Ltd., 965 F.3d 571, 576 (7th Cir. 2020). Learning information, including confidential information, during the course of employment is considered "lawful means." Sokol Crystal Prod. Inc. v. DSC Commc'ns Corp., 15 F.3d 1427, 1429 (7th Cir. 1994), Packaging Corp. of Am., Inc. v. Croner, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020).

If Allstate had conducted any reasonable investigation of the facts before it filed and continued this lawsuit, Allstate would have known there was no good faith, factual basis for alleging misappropriation.  Had Allstate conducted any reasonable investigation of the facts, Allstate would have learned that Freeman regularly shredded her notes. Document 35, ¶¶ 24-31, 42-46. The Declarations of Freeman, LeeAnn Ackley, and Jodi Newell establish that both when the Beaulieu Agency used a shredding service and later when it used its own personal office shredder, Freeman regularly shredded her notes. Id.

While Allstate did not have the Freeman, Ackley, and Newell declarations when it filed its lawsuit, Allstate learned soon after commencing this action that Freeman's co-workers could establish that she regularly shredded her notes. In her Initial Disclosures dated October 10, 2024, Freeman disclosed that employees or former employees of the Beaulieu Agency would know about Freeman's practice of tearing up pages from her planners. Corris Decl. ISO Motion for Rule 11 Sanctions, Exh. A. In a supplemental disclosure on December 11, 2024, Freeman produced a

declaration from one of those employees, LeeAnn Ackley, in which she stated under penalty of perjury that Ackley personally saw that Freeman had a cardboard box by her desk, that Ackley personally saw Freeman put papers into the cardboard box to be shredded, that Ackley also saw Freeman tear the papers into small pieces before she put them into the cardboard box, and that Ackley and other employees used to joke about Freeman tearing up papers that were going to be shredded anyway.

On January 15, 2025, Brett Beaulieu identified another employee, Jodi Newell, who might have knowledge. Allstate could have interviewed Ackley or Newell, but didn't. Allstate would have learned that Freeman had a container next to her desk, and that she would put her notes into the container for shredding. Allstate would have learned that when Freeman made notes in one of her spiral notebooks or personal planners, she would tear the page out of the notebook or planner and then tear the page into smaller pieces before putting it into the container. Document 35. Allstate would have learned that Freeman or a co-worker would regularly take the papers to the bin provided by the shredding service or to Beaulieu's shredder.[4]  Id.

Jodi Newell regularly took Freeman's container to the Beaulieu's shredder, and she states under penalty of perjury that having to feed the torn- up pieces into the shredder "drove [her] crazy." Id.  Freeman tore up her notes after entering the information into Allstate's eAgent System.

Allstate has cited cases to support an argument that "plaintiffs are often required to construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not what the plaintiffs allege happened did in fact take place."  In making that argument, Allstate frivolously ignores that the

---

[4] When the Beaulieu Agency moved offices in 2021, Brett Beaulieu told employees that that he didn't want to move anything that didn't need to go. Document 35, ¶ 32. Freeman stripped the spirals out of her notebooks and threw the pages into the shredding bins. LeeAnn Ackley witnessed Freeman doing that. Document 35, ¶¶ 32-36.

cases it cited involved product or design similarities. They stand for the proposition that if the plaintiff can show access and substantial similarity to the defendant's product or design, plaintiff can survive summary judgment. Sokol, 15 F.3d 1427 (access to design and question of similarity of the parties' products -- a voltage controlled crystal oscillator – presented jury question); Metso Mins. Indus., Inc. v. FLSmidth-Excel LLC, 733 F. Supp. 2d 965 (E.D. Wis. 2010).(issue of similarity between the parties' respective high performance conical rock crushers an issue for jury), Stratienko v. Cordis Corp., 429 F.3d 592, 598 (6th Cir. 2005) ( "We cannot find in the record that Dr. Stratienko has presented evidence of which features [in a catheter] were novel to his design, and thus he has failed to show sufficient similarity between the innovative aspect of his idea and Cordis' device to provide enough of a circumstantial inference to create a genuine issue of material fact"), SJ Handling Sys. V. Heisley, 753 F.2d 1244 (3d Cir. 1985) (affirming and reversing various factual and legal findings relating to probability of success at preliminary injunction stage;  the court's statement about presenting a "web of perhaps circumstantial evidence" was made with respect to the use of empirical formulae used in systems design that are "clearly at the very core of trade secret protection").

This is not a product or design case, and Allstate knows it.  Neither Allstate nor Brett or Dawn Beaulieu can contradict what Freeman and other employees said. No Allstate employee has personal knowledge of what Freeman was doing with the notes she made in the Beaulieu Agency's offices. Document 35, ¶ 76. To the extent Allstate relies on the Beaulieus, it relies on their speculation. Asked whether Freeman could have been shredding notes, documents, pages when he wasn't present, Brett Beaulieu answered, "I can't speculate.  I don't know." Document ¶ 77. Asked whether in May 2023, anyone at his Agency had looked and seen what, if anything, was written in any notebook or planner that Freeman had in her office, Beaulieu answered, "Again, I would have

to speculate. There is no way for me to know that." Document 35, ¶ 78. And asked as the designee of the agency, whether the Beaulieu Agency knew of anyone who actually saw what, if anything, was written in a notebook or planner that Freeman had at the office in May 2023, Beaulieu answered, "I can speculate Jodi Newell could have; but, again, it's speculation." Document 35, ¶ 79. Allstate must never have asked Ms. Newell, because Ms. Newell has declared under penalty of perjury, that on a daily basis, she would pick up Freeman's container and take it to the shredder. Document 35, ¶ 46.

The deposition excerpts attached as Exhibit F to the Corris Declaration evidence that Dawn Beaulieu has no personal knowledge that contradicts Freeman's, Ackley's, and Newell's declaration that Freeman regularly shredded her notes.

Brett and Dawn Beaulieu were on vacation in June 2023. When they returned, the Beaulieus respected Freeman's privacy. Document 35, ¶ 80. When Freeman resigned, the Beaulieus did not look in her personal planners or notebooks. Id. Beaulieu as corporate representative testified it would have been "the highest level of personal violation if we had asked to look at something." Id. The point is, they didn't look. They have no personal knowledge that Freeman misappropriated any trade secrets.

Dawn Beaulieu testified that she knows Jodi Newell shredded things in the office. She doesn't know if it was daily or weekly, but knows that Newell shredded things. Ms. Beaulieu also testified that she had seen Freeman tear paper but didn't know where it came from. Ms. Beaulieu also testified that she would be "guessing" as to whether in 2022 or 2023 any other employee of the Beaulieu Agency saw Freeman taking home any papers or pages with customer names or contact information including but not limited to notes made on notepads or in notebooks or personal planners instead of shredding those papers or pages.

Tim McChrystal is Allstate's sales leader for the Beaulieu Agency's territory. Document 35, ¶ 84. Brett Beaulieu said that he talked to McChrystal at Allstate before the lawsuit was filed about whether Freeman had misappropriated any trade secrets. Document 35, ¶ 85. Beaulieu told McChrystal that he thought Freeman was "going after our business, taking customers – Allstate customers" and that "she must have some means to get ahold of them." Id.   Beaulieu's corporate representative then testified as follows:

> Q.     So when you said that she must have some means, were you speculating?
> MS. MOLDONADO: Objection.  Calls for a legal conclusion.  You can answer.
> THE WITNESS:      Yeah, I guess I was…
>
> Document 35, ¶ 83.

The Beaulieu Agency had no knowledge that Freeman had downloaded or exported information from Allstate's database – called DASH -- before she left. Document 35, ¶¶ 83, 86. Beaulieu testified that McChrystal said he had somebody run a report and that the results of the search were "[W]e didn't have anything" – which didn't surprise Beaulieu. Document 35, ¶ 87. Beaulieu testified that when McChrystal said he didn't have anything, that was with reference to whether Freeman had somehow gone into DASH or gone into their system and exported, downloaded, or copied any of the information in the system about the accounts she was handling. Document 35, ¶ 88. Allstate has not identified any expert or produced any report that Freeman has misappropriated any of Allstate's electronically stored information.  Allstate admits that it has not forensically examined any Allstate or Beaulieu device. Document 35, ¶ 87.

When Brett Beaulieu or Dawn Beaulieu were in the office they used at the Beaulieu Agency's Oshkosh offices on Jackson Street, they could not see into Freeman's office. They also could not see the personal office shredder. Document 35, ¶¶ 40-41.  When Freeman and Newell say that Freeman tore up her notes, Allstate cannot contradict them.  When Freeman and Newell

say that Newell shredded Freeman's notes on a daily basis and that Freeman would also take papers

to the shredder, Allstate cannot contradict them.  Allstate undertook no investigation and has no

admissible evidence to prove that Freeman misappropriated any of Allstate's alleged trade secrets.

Allstate has violated Rules 11(b)(2) and 11(b)(3).  Allstate and its attorneys should be

sanctioned pursuant to Rule 11(c)(1).

**III.    ALLSTATE HAS VIOLATED RULES 11(b)(2) and 11(b)(3), BY FILING AND CONTINUING ITS BREACH OF CONTRACT CLAIM, BOTH BECAUSE ALLSTATE HAS IGNORED WELL-ESTABLISHED LAW AND BECAUSE ALLSTATE FAILED TO INVESTIGATE WHETHER IT HAD AND CONTINUED TO HAVE A GOOD FAITH FACTUAL BASIS FOR THE CLAIM.**

**A.    Rule 11 requires that Allstate study the law before filing a claim. If Allstate had studied the law before filing, Allstate would have known that its confidentiality or non-disclosure provision in the Agreement is unenforceable because it lacks a reasonable time period.**

Count I of Allstate's Complaint alleges that Freeman breached the Agreement by

"misusing Allstate confidential information to solicit Allstate customers, soliciting Allstate

customers, and refusing to return Allstate confidential information to Allstate." Document 1, ¶ 92.

However, the restrictive covenant in the Agreement prohibiting use or disclosure of confidential

information violates Wis. Stat., sec. 103.465 and is, therefore, "illegal, void, and unenforceable

even as to any part of the covenant or performance that would be a reasonable restraint." More to

the point of the instant motion, it should have been plain to Allstate that the confidentiality

covenant on its face violated the statute.

Wis. Stat., sec. 103.465 reads as follows:

> **103.465 Restrictive covenants in employment contracts.**  A covenant by an assistant, servant or agent not to compete with his employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal.  Any such restrictive covenant imposing an unreasonable restraint is illegal, void and

unenforceable even as to so much of the covenant or performance as would be a reasonable restraint.

Wis. Stats., sec. 103.465 prohibits "blue-penciling." <u>Streiff v. American Family Mutual Insurance Company</u>, 118 Wis.2d 602, 613–14, 348 N.W.2d 505 (1984). Restrictive covenants are *prima facie* suspect; they must withstand close scrutiny to pass legal muster as being reasonable; they will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires; and they are to be construed in favor of the employee. <u>Streiff,</u> 118 Wis. 2d at 610-611, <u>Star Direct, Inc. v. Dal Pra</u>, 2009 WI 76, ¶ 19, 319 Wis. 2d 274, 767 N.W.2d 898 (reaffirming canons of construction). Wis. Stat., sec. 103.465 "evidences a strong public policy" against the enforcement of unreasonable restraints. <u>Tatge v. Chambers & Owen, Inc.</u>, 219 Wis.2d 99, ¶ 35, 579 N.W.2d 217 (1998).

Allstate's confidentiality restrictive covenant reads as follows:

Service Provider [e.g., Freeman]agrees that he/she will not **at any time** or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company; nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agent in performing services under the agency agreement.

Document 1-1, Agreement, ¶ 4 (emphasis added).

Allstate's definition of confidential information is not limited to trade secrets; it includes both confidential information and trade secrets:

Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; **certain information and material identified by the Company as confidential <u>or</u> information considered a trade secret** as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

Document 1-1Agreement, ¶ 3 (emphasis added).

As previously stated, Rule 11 requires counsel to study the law before representing its contents to a federal court. Thornton v. Wahl, 787 F.2d at 1154. Every lawyer must do the necessary work to find the law *before* filing. Id.  That Section 103.465 applies to non-disclosure provisions is well-established. See Tatge v. Chambers & Owen, Inc., 219 Wis.2d 99, at ¶ 25-29 (statute applies to non-disclosure covenants, and temporal restriction such as "not at any time" violates the statute). Gary Van Zeeland Talent, Inc. v. Sandas,  84 Wis. 2d 202, 218, 262 N.W.2d 242 (1978) (time period "during or after the term of his employment" in confidentiality covenant violates statute). In Nalco Chemical Co. v. Hydro Technologies, Inc., 984 F.2d 801 (7th Cir. 1993), the Court applied Wisconsin law and held that a time period in a confidentiality covenant prohibiting use or disclosure "either during the term of his employment or after its termination" violated sec. 103.465. Likewise, in Friemuth v. Fiskars Brands, Inc., 681 F. Supp. 2d 985, 988-990 (W.D. Wis. 2010) the district court held that a covenant on use or disclosure of confidential information "during the term of this Agreement [and] following its termination" violated the statute.

In  Friemuth, the Court held that the covenant at issue violated sec. 103.465 and was unenforceable because the covenant was not limited to trade secrets, applied to non-trade- secret confidential information, and lacked any time period.  The court said:

> Even if a nondisclosure provision restricts  disclosure of trade secret information, if it also restricts disclosure of information that is not a trade secret, § 103.465 requires a time limitation on the provision. This is because, when one part of the covenant is unreasonable, the entire covenant becomes unenforceable…. Because a restriction on disclosure of non-trade secret information would be per se unreasonable without a time limitation under § 103.465, Nalco, 984 F.2d at 803, the remaining restrictions are unenforceable as well….

> In this case, the nondisclosure provisions cover trade secrets, but also cover other types of information… Because the provisions lack any time limitation, I agree with plaintiff that the covenants are unenforceable.

> The Seventh Circuit decided Nalco more than 30 years before Allstate filed this action.

Friemuth was published in 2010.  In 2006, the district court for the Eastern District of Wisconsin

cited <u>Nalco</u> and <u>Van Zeeland</u> to invalidate a confidentiality covenant that restricted use or disclosure for "all times thereafter." <u>Sysco Food Services of E. Wis., LLC v. Ziccarelli</u>, 445 F. Supp. 2d 1039, 1053 (E.D. Wis. 2006).

Allstate violated Rule 11(b)(2) when it filed and continued its breach-of-contract claim to enforce its confidentiality clause that lacks any time period.

> **B.    Allstate's claim that Freeman breached the customer non-solicitation clause is also frivolous in violation of Rule 11 (b)(3) because Freeman provided Allstate with customer affidavits and declarations evidencing that Freeman did not solicit them and setting forth their respective reasons for leaving Allstate. Freeman did not contact customers – almost all of whom were family or friends – to solicit their business but waited for them to contact her for their insurance needs. Allstate never undertook to contact the customers.**

A party and its attorneys violate Rule 11 if the party's factual contentions do not have evidentiary support or are not likely to have evidentiary support after a reasonable opportunity for further investigation." <u>McGreal v. Vill. of Orland Park</u>, 928 F.3d at 558.  Here, Allstate does not have evidentiary support for its allegations that Freeman breached the Agreement by soliciting the former Allstate's customers who have become Freeman's customers at the Freeman Schmick Agency.  Further, Allstate has continued this action without a factual basis for alleging solicitation despite having had a reasonable opportunity to investigate the customers' sworn affidavits and, later their declarations, stating that Freeman did not solicit them.

After Freeman left the Beaulieu Agency, she waited for customers to contact her about their insurance needs.  Almost all of the customers who contacted her for insurance were family or friends, yet even as to them, she did not pursue them and did not take steps to obtain insurance for them until they first requested her assistance with their insurance needs. See Document 57, ¶¶ 115-185.

Freeman stated under oath on May 23, 2024 that she did not directly or indirectly solicit business from any prior client of the Brett Beaulieu Agency – in other words from any Allstate

20

customer. See Exhibit D to the Complaint (Document 1-4). She further stated that any client that she currently serviced that was previously with the Brett Beaulieu Agency had reached out to her. Id. Freeman obtained Affidavits of NonSolicitation from the clients she had serviced and provided those Affidavits to Allstate.

On October 10, 2024, Freeman provided initial disclosures to Allstate that included all of the sworn affidavits from her former Allstate/Beaulieu customers in which they gave their respective individual reasons for leaving the Beaulieu Agency. See Document 30, ¶ 12, and Document 33. [5] Freeman's Initial Disclosures disclosed that persons likely to have knowledge of discoverable information included "[v]arious former customers of Brett A. Beaulieu Agency who are identified in the Nonsolicitation affidavits being produced with these Initial Disclosures."

On December 11, 2024, Freeman served answers to interrogatories in which she stated that the customers all reached out to her and provided reasons the customers told her for leaving Allstate and the Beaulieu Agency. Freeman's answers to Allstate's interrogatories identified customers. Allstate had contact information for every one of those customers. Allstate had every opportunity to investigate whether the customers left the Beaulieu Agency because Freeman solicited them. Allstate did not depose any of the customers. Allstate's responses to Freeman's requests for admissions, the Beaulieu Agency's corporate deposition, and Dawn Beaulieu's deposition establish that Allstate did not contact any of the customers to ask whether Freeman solicited them. The undersigned later obtained additional declarations from many of the customers and provided those to Allstate in support of Freeman's motion for summary judgment..

## IV.    ALLSTATE VIOLATED RULE 11(b)(3) BECAUSE IT HAS ALLEGED AND CONTINUED ITS CLAIM FOR TORTIOUS INTERFERENCE WITHOUT FACTS

---

[5] Freeman testified at a deposition on April 15, 2024, that she obtained the form of the Affidavits of NonSolicitation from an attorney; that Freeman talked to each of the customers, that the customers told her their reasons for leaving the Beaulieu Agency, that she typed the reasons the customer gave her into paragraph 2 of the customer's Affidavit after the word "because," and that each customer signed before a notary public.

**TO SUPPORT THE REQUIRED ELEMENT OF INTENTIONAL AND IMPROPER CONDUCT.**

The elements of a tortious interference claim are (1) the plaintiff had a contract or prospective contract with a third party, (2) the defendant interfered with the contractual relationship, (3) the interference was intentional, (4) a causal connection exists between the interference and the damages, and (5) the defendant was not privileged or justified to interfere. Dorr v. Sacred Heart Hosp., 228 Wis. 2d 425, 456–57, 597 N.W.2d 462 (Wis. Ct. App. 1999).

It is well-settled that "[i]n order **to succeed on a tortious interference** with a contract claim, the **plaintiff must establish that someone** 'intentionally and **improperly interferes** with the performance of a contract.'" Sysco, 445 F. Supp. 2d at 1055 (citing Wausau Medical Center, S.C. v. Asplund, 182 Wis. 2d 274, 297, 514 N.W.2d 34 (Ct. App. 1994) ((emphasis added). "Wisconsin law also requires that the intentional interference be 'improper.'" Stucchi USA, Inc. v. Hyquip, Inc., No. 09-CV-732, 2010 WL 2990966, *6 (E.D. Wis. July 28, 2010) (citing Mackenzie v. Miller Brewing Company, 2000 WI App 48, ¶¶ 62-64, 234 Wis. 2d 1, 608 N.W.2d 331 (holding "interference alone, however, does not establish the tort; the interference must be 'improper'" and concluding "that Mackenzie failed to provide any evidence of improper conduct that would constitute tortious interference with his prospective contract."). "Under Wisconsin law, an individual inducing a third party to terminate a contract is liable for tortious interference only if he uses improper means, *i.e.*, physical force or fraudulent misrepresentation, to induce termination." Landess v. Borden, Inc., 667 F.2d 628, 631 (7th Cir. 1981) (citing Pure Milk Prods. Coop. v. Nat'l Farmers Org., 64 Wis. 2d 241, 260, 219 N.W.2d 564 (1974)).

Allstate seeks tort and punitive damages in its tortious interference claim. Document 1, ¶¶ 136-137. If Allstate bases its allegation of improper conduct on misappropriation of trade secrets, its claim is preempted. Wis. Stat., sec. 134.90(6). If Allstate bases its allegation of improper

22

conduct on breach of contract, it cannot base its tortious interference claim on Freeman's breach of contract.  Had Allstate researched the law before or after filing its Complaint, Allstate would have discovered that Wisconsin does not permit recovery of punitive damages on contract claims. Mohns Inc. v., BMO Harris Bank Nat'l Ass'n, 2021 WI 8, at ¶ 58, 395 Wis. 2d 421, 954 N.W.2d 339, Entzminger v. Ford Motor Co., 47 Wis.2d 751, 757-58, 177 N.W.2d 899, 903 (1970 ), Chuck Wagon Catering, Inc. v. Raduege, 88 Wis. 2d 740, 277 N.W.2d 787 (1979), Mackenzie, 2001 WI 23, ¶ 28.

For purpose of this Rule 11 motion, beyond Allstate's failure to research the law, its tortious interference claim is frivolous because Allstate has no factual or legal basis for asserting improper interference.  As set forth above, Allstate has no factual basis for alleging that Freeman misappropriated any trade secret or confidential information. The confidentiality covenant is unenforceable.  Allstate has no evidence to contradict the sworn statements of customers that Freeman did not solicit them. For these reasons, Allstate has violated Rule 11(b)(3) by maintaining the tortious interference cause of action.[6]

## V.    ALLSTATE HAS VIOLATED RULES 11(b)(2) and 11(b)(3) BY FILING AND CONTINUING IT REPLEVIN CAUSE OF ACTION BECAUSE REPLEVIN REQUIRES THAT THE PROPERTY AT ISSUE BE TANGIBLE PROPERTY.

In Wisconsin, replevin applies only to chattels and, therefore, cannot apply to intangible property. See e.g., Walker v. Daley, 80 Wis. 222, 49 N.W. 812, 813 (1891) (dismissing replevin claim seeking certificates of location under a patent); Flannigan v. Goggins, 71 Wis. 28, 36 N.W. 846, 848 (1888) (same as to title to land).  In Walker, the Supreme Court acknowledged, "whether replevin…could be maintained depends upon whether the claims [were based on] chattels."

---

[6] Freeman has other defenses to the tortious interference claim that have been presented in support of her motion for summary judgment. See Documents 27, 34, and 35 and other supporting documents cited in Document 35.

A claim for replevin is very much like a claim for conversion.  Wisconsin conversion is the wrongful exercise of dominion or control "over a chattel." Production Credit Ass'n of Madison v. Nowatzski, 90 Wis. 2d 344, 353-54, 280 N.W.2d 118 (1979) (citing Production Credit Ass'n of Chippewa Falls v. Equity Co-op Livestock Sales Ass'n, 82 Wis. 2d 5, 10, 261 N.W.2d 127 (1978). It is well-established that "a claim for conversion in Wisconsin is limited to chattel."  Rigsby v. Am. Fam. Mut. Ins. Co., No. 14-cv-23 -bbc, 2014 WL 1515493, *7 (W.D. Wis. Apr. 17, 2014) Intangible property is not considered a chattel, and therefore is not subject to a conversion claim. Maryland Staffing Servs., Inc. v. Manpower, Inc., 936 F. Supp. 1494, 1507 (E.D. Wis. 1996) (dismissing claim for conversion of intangible property).

Electronic documents are not tangible property and, therefore, cannot be the subject of a claim for conversion.  Epic Sys. Corp. v. Tata Consultancy Services Ltd., 14-CV-748-WMC, 2016 WL 4033276, *27-28 (W.D. Wis. July 27, 2016).("Absent some indication that Wisconsin courts would embrace such an expansion, the court is unwilling to adopt a broader definition of a conversion claim than currently is recognized based solely on intangible property").

Replevin is a cause of action "which lies to gain possession of *personal chattels* which have been taken from the plaintiff unlawfully." In re Braun, 3 F.2d 247, 249 (7th Cir.1924) (emphasis added). In other words, replevin actions seek the return of tangible items to their rightful owner. *See* 66 Am.Jur. 2d *Replevin* § 1 (2004) ("Replevin is a remedy stemming from the common law and it is a proceeding by which the owner or one who has an interest in a chattel taken or detained seeks to recover possession of the chattel").

Allstate seeks return of contact information from Freeman's personal phone.  After Freeman submitted her notice of resignation, Freeman deleted customer texts and customers who were not her family or friends from her contact list.  She scrolled through her phone in Dawn

Beaulieu's presence.  Freeman slowly opened text messages and showed Dawn Beaulieu what texts remained on the phone. Freeman identified the text chains with her family and friends.  She did the same thing for her contact list. Document 35, ¶ 53.

For purposes of this Rule 11 motion with respect to Allstate's replevin claim, any contact information on her phone would be intangible. Testifying as a corporate representative of the Beaulieu Agency, an agent of Allstate, Brett Beaulieu admitted that to the extent there were names and phone numbers on Freeman's phone, those names and numbers were electronically stored information and not a tangible list. Document 35, ¶ 105.  Allstate's replevin claim is frivolous and sanctionable.

**CONCLUSION**

This is the kind of case that warrants imposition of sanctions.  Freeman scrupulously and regularly shredded notes of her telephone conversations and to do lists.  Allstate has sued Freeman for secret trade misappropriation without knowing what trade secrets, if any, were on her notes or whether she had misappropriated any of her notes. Allstate's claims of trade secret misappropriation  are based on nothing more than speculation.  Allstate has pursued a claim for breach of a confidentiality covenant despite knowing that the confidentiality covenant lacks a time period and under well established case law is therefore unenforceable.

Allstate has imposed on Freeman substantial litigation fees and expenses to defend herself against Allstate's frivolous claims.  Rule 11 provides her with sanctions as a remedy, including compensation  for her fees and expenses incurred to defend herself. Freeman respectfully requests that the Court impose Rule 11 sanctions to make her whole.