IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALLSTATE INSURANCE COMPANY,

                              Plaintiff,

         v.

DEANNA FREEMAN,

                              Defendant.

OPINION and ORDER

24-cv-479-jdp

---

Defendant Deanna Freeman worked as an insurance agent for the Beaulieu Agency, LLC, which sold insurance products on behalf of plaintiff Allstate Insurance Company. In 2023, Freeman resigned her position with the Beaulieu Agency and began selling insurance products for a competitor. Allstate alleges that Freeman took confidential customer and policy information with her when she resigned and then used that information to solicit Allstate customers. Allstate asserts claims for misappropriation of trade secrets, breach of contract, tortious interference with a contract, and replevin.

Two motions are before the court. First, Freeman moves for summary judgment, contending that Allstate lacks sufficient evidence to create a triable issue on any of its claims. The court will grant Freeman's motion. Allstate has failed to adduce evidence from which a reasonable jury could find that Freeman took any information that would have qualified for trade secret protection. Nor could a reasonable jury find that she solicited customers in violation of her non-competition agreement or used improper means to convince customers to switch their insurance policies away from Allstate.

Second, Freeman moves for sanctions under Federal Rule of Civil Procedure 11, contending that Allstate's claims are frivolous. That motion will be granted in part. Allstate

had at least an arguable legal and factual basis to believe that Freeman violated her non-solicitation agreement, but its other claims were baseless. The court will award Freeman her reasonable attorney fees attributable to the sanctionable conduct. The parties will have three weeks to submit a stipulation on fees, or, if they cannot agree on the amount of fees, Freeman will have until that time to submit a fee petition.

## UNDISPUTED FACTS

The following facts are undisputed, except where noted.

Defendant Deanna Freeman is a former employee of the Beaulieu Agency, LLC, which is an independent contractor that sells insurance products for plaintiff Allstate Insurance Company. The Beaulieu Agency is located in Oshkosh, Wisconsin and is owned by Brett and Dawn Beaulieu.

Freeman began working for the Beaulieu Agency as an insurance agent in 2010. As part of her job, Freeman had access to internal databases that contained information about Allstate's customers and their insurance policies. She also sometimes received lists of customer and policy information via email. Freeman signed a confidentiality and non-competition agreement with Allstate when she joined the Beaulieu Agency, in which she agreed not to disclose customer or policy information to third parties or to use that information for her own benefit. She also agreed that for one year after the termination of her employment, she would not solicit Allstate customers or sell insurance products from any location within one mile from the office where she had previously sold Allstate products. Dkt. 31-1.

While Freeman was employed at the Beaulieu Agency, she sometimes used her personal cellphone to communicate with customers. The Beaulieus disapproved of this but did not

2

prevent Freeman from using her personal cellphone. Freeman also took copious handwritten notes during her phone calls with customers. The parties dispute what happened to these notes: Freeman says that she shredded them, but Allstate says that Freeman often took notes home with her.

Freeman resigned from the Beaulieu Agency at the end of July 2023. According to the Beaulieus, Freeman said that she was retiring from the insurance business altogether, but Freeman disputes this and says that she told them only that she was "not going to continue as an Allstate agent." Dkt. 31, ¶ 50. Freeman cleaned out her office when she left the Beaulieu Agency. Freeman also told Dawn Beaulieu that she had deleted customer contacts from her phone other than personal friends and family. Dkt 35 (Beaulieu Agency 30(b)(6) Dep. 144:22–145:9). The Beaulieus allowed Freeman to keep her cellphone number, although they testified that they wouldn't have done so if they had known that Freeman was going to continue working in insurance.

Shortly after her resignation, Freeman became a partner at the Schmick Agency, which sells insurance products for Erie Insurance, an Allstate competitor. Freeman advertised her insurance services on her personal Facebook account, which some Allstate customers saw because she was Facebook friends with them. She did not affirmatively reach out to former Allstate customers to induce them to switch their policies because she believed that this would violate her non-competition agreement with Allstate. But when Allstate customers contacted her, Freeman sent them her new contact information and offered to provide quotes for new insurance policies. Several of Freeman's former customers dropped their Allstate policies after talking with Freeman.

Brett and Dawn Beaulieu became aware of Freeman's activities after noticing an unusually high number of what they described as "suspicious" cancellations in the Oshkosh-Omro area, which is where Freeman worked. The Beaulieus said that many of the cancellations were made in the middle of policy periods, that some were made using forms that were written in Freeman's handwriting and had the "new agent" section left blank, that some customers acted defensively when they were asked why they were cancelling, and that some cancellations were made after hours via the Allstate hotline, which the Beaulieus believed was done so that the customers could cancel their policies without speaking to an agent. The Beaulieus believed that Freeman was using Allstate's confidential information and soliciting Allstate's customers in violation of her non-competition agreement; they attributed the unusual manner in which the cancellations were made to Freeman's "sneaking around" to avoid detection. For her part, Freeman admits that she filled out cancellation forms for some customers and told others that they could cancel after hours if they didn't want to speak to an agent. She denies that she used Allstate's confidential information or that she violated her non-competition agreement.

The court will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

### A. Motion for summary judgment

Allstate's claims fall into four categories: misappropriation of trade secrets, breach of contract, tortious interference with contract, and replevin. Freeman moves for summary judgment on all of Allstate's claims. Summary judgment is appropriate if there is no genuine dispute as to any material fact and judgment is appropriate as a matter of law. Fed. R. Civ. P.

56(a). In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment will be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

### 1. Misappropriation of trade secrets

Allstate contends that Freeman misappropriated its trade secrets in violation of Wisconsin's Uniform Trade Secrets Act (UTSA), Wis. Stat. § 134.90, and the federal Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1836. The parties do not distinguish between state and federal law, and this court has recognized that the UTSA and DTSA are functionally equivalent. *Eternix, Ltd. v. CivilGEO, Inc.*, No. 23-cv-633-jdp, 2025 WL 1179333, at *10 (W.D. Wis. Apr. 23, 2025); *Fiskars Finland Oy Ab v. Woodland Tools Inc.*, No. 22-cv-540-jdp, 2024 WL 3936444, at *15 (W.D. Wis. Aug. 26, 2024). The court will refer to Wisconsin's UTSA in its analysis, but the analysis would apply as well to the DTSA.

The UTSA bars disclosing or using without consent a trade secret acquired through improper means. It defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c). Allstate, as the party seeking protection under the UTSA, bears the burden of showing that the information Freeman took is actually a trade secret, which requires showing that it "is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002); *see also Wis. Elec. Power Co. v. Pub. Serv. Comm'n of Wis.*, 106 Wis.2d 142, 146, 316 N.W.2d 120, 122 (Ct. App. 1981).

In this case, the alleged trade secrets are information about Allstate's customers and their insurance policies. Wisconsin courts have been somewhat wary about conferring trade secret protection to customer information, recognizing that protecting that type of information limits competition. *Am. Fam. Mut. Ins. Co. v. Roth*, 485 F.3d 930, 933 (7th Cir. 2007) (citing *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis.2d 202, 267 N.W.2d 242, 249 (1978)). A party seeking protection for its customer information must show that the information "has value apart from its value in limiting competition;" in other words, "it represents an investment on the part of the firm seeking to protect it." *Id.* Generally, a customer list qualifies if it contains company-specific information about customers' product preferences. *See id.* (names in insurance database were protectable because they were "filtered for their suitability to buy insurance"); *Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, No. 17-cv-5826, 2023 WL 5334638, at *14 (N.D. Ill. Aug. 18, 2023) (compilation of data about Allstate customers and the policies that they hold was protectable). Bare bones lists of customer names and contact information on the other hand are generally not protectable, because that type of information is readily ascertainable via other means. *See Abbott Laboratories v. Norse Chemical Corp.*, 33 Wis. 2d 445, 147 N.W.2d 529 (1967) (list of customer names, addresses, and key contacts was not protectable because it contained no specific information about the product or marketing needs

6

of any specific customer); *Gary Van Zeeland Talent*, 84 Wis. 2d at 207 (list of customer names used to send Christmas cards was not protectable).

The parties agree that Freeman had access to confidential Allstate customer and policy information that might qualify for trade secret protection when she worked for the Beaulieu Agency. Allstate stores its customer and policy information in two secure databases: eAgent and DASH. Together, these databases contain information about customers' names and contact information, the types of insurance policies they hold, their premium amounts, descriptions of the assets protected by their policies, their claims histories, and other insurance needs and pricing information. Dkt. 57, ¶¶ 70, 81. Freeman accessed these databases regularly both in the office and while working from her laptop at home. Freeman also received confidential customer and policy information via her Allstate email, including several audit reports containing large lists of customers that Dawn Beaulieu sent her shortly before she left Allstate. Dkt. 45-4. But Freeman lost access to the databases and her Allstate email when she resigned from the Beaulieu Agency. Dkt. 57, ¶ 71. Allstate concedes that it has no evidence that Freeman downloaded, exported, or forwarded any information from the databases or her Allstate email before she lost access. *Id.* ¶ 72.

Although it lacks evidence that Freeman took any electronic confidential information, Allstate says that Freeman took its confidential information in two other ways. First, Allstate says that Freeman used her personal cellphone to contact customers, so she had some customer contact information saved on her phone. The parties dispute whether Freeman deleted all the customer contact information from her phone before she resigned, but that dispute isn't material to whether Freeman misappropriated trade secrets. Customer names and contact information on their own are readily ascertainable, so retaining this type of information

wouldn't amount to misappropriation of trade secrets. *See Abbot Laboratories*, 33 Wis. 2d at 465–68.

Second, Allstate says that Freeman kept copious handwritten notes during her calls with customers and that she asked her assistant to print a large customer list on at least one occasion. But the only evidence Allstate provides to support these facts is the testimony of Dawn Beaulieu, who admitted that she did not have personal knowledge of what Freeman had written in her notes or what she had printed. Dkt. 45-1 (Dawn Beaulieu Dep. 66:12–67:8; 91:13–94:13). Dawn also said that she didn't know whether Freeman had kept anything her assistant printed out for her. Dawn's testimony would be inadmissible; it provides no basis for a reasonable jury to infer that Freeman kept information about customers' insurance policies, claims histories, or any other company-specific information that would qualify for trade secret protection. Essentially, Allstate accuses Freeman of taking notes and printing documents, both of which appear to be entirely normal activities for an insurance agent to engage in during the course of her work. No reasonable jury could infer misappropriation from these activities either.

Allstate says that even though it lacks direct evidence that Freeman kept information about its customers and insurance policies, it can show that Freeman kept and used this information via circumstantial evidence. Allstate is correct that circumstantial evidence can sometimes support a reasonable inference of misappropriation. *SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985) ("Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences."); *see also Ameriprise Fin. Servs., Inc.*, 2023 WL 5334638, at *22–26. In *Ameriprise* for instance, another case in which Allstate was the plaintiff, Allstate contended that Ameriprise had misappropriated its trade

secrets by requiring agents who switched from Allstate to put together lists of customers with whom they were family, friends, or acquaintances. *Id.* at *7. The court concluded that Allstate had created a triable issue on misappropriation based on the following circumstantial evidence: (1) Ameriprise asked agents to compile the list before they left Allstate; (2) many of the lists contained hundreds of customers; (3) Ameriprise directed agents to submit the lists in spreadsheet form, with significant amounts of information; and (4) some emails with agents suggested that at least a few of them had downloaded the information they put in their lists directly from Allstate's databases. *Id.* ¶¶ 24–26.

In this case, however, Allstate's circumstantial evidence fails to create a triable issue on misappropriation. Allstate's strongest argument is that a jury could infer that Freeman took confidential information because "[a]fter leaving the Beaulieu agency, Freeman was able to generate quotes for Allstate customers without those customers providing their policy information." Dkt. 58, ¶ 24. But Allstate's evidence doesn't actually support that assertion. Allstate points to text conversations between Freeman and three customers: April Coe, Brett Ellis, and Daniel Lenz. But in each case, it is clear from the text conversations how Freeman got the necessary information to generate their quotes. Dkt. 45-11; Dkt. 45-14; Dkt. 45-18. Before Freeman quoted Coe, Coe asked her, "How do I get to the deck [declaration] pages you need?" Freeman responded, and Coe said, "Ok. I think I got it. I'll send it over." Dkt. 45-11, at 5. Freeman then asked for Coe's birthday and driver license number before quoting her. *Id.* As for Brett Ellis, Allstate points to a September 13, 2023, text where Freeman asked, "How is your truck titled?" and then followed up, "Nevermind I see it, I never deleted our chat." Dkt. 45-14, at 5. Two days earlier, Ellis had given Freeman his truck's title information via text, so the only reasonable inference is that Freeman was talking about that conversation, not

Allstate's confidential information. *Id.* at 4. As for Lenz, Allstate says that Freeman pulled quotes for him without asking for any policy information. But the texts show that Lenz gave Freeman the username and password for his Allstate account and asked her to "review our Allstate policies and give your recommendations and quotes." Dkt. 45-18, at 2. The only reasonable inference is that Freeman pulled the necessary information from Lenz's Allstate account, not from any Allstate confidential information that she had kept. None of these text messages support Allstate's assertion that Freeman relied on confidential information to quote any former Allstate customers.

Allstate also argues that a reasonable jury could infer misappropriation because of the suspicious way Freeman acted when she left the Beaulieu Agency. Specifically, Allstate says that Freeman lied to the Beaulieus that she was retiring from insurance when in actuality, her plan was to join the Schmick Agency. Further, after Freeman's resignation, the Beaulieu Agency noticed a number of "suspicious" cancellations made after hours or submitted on forms that didn't include the new insurance agent, which the Beaulieu agency interpreted as Freeman "sneaking around and trying not to get caught." Dkt. 36 (Beaulieu Agency 30(b)(6) Dep. 149:5–9).

A reasonable jury could infer from the above that Freeman was speaking with Allstate customers about changing their insurance policies and that she didn't want the Beaulieu Agency to know that. But it doesn't follow that Freeman misappropriated Allstate's confidential information, because she could have targeted Allstate customers using only publicly available information. A reasonable jury could infer misappropriation if the number of customers who switched were so high that it would be unlikely that Freeman could have targeted them all without using confidential information. *See Ameriprise*, 2023 WL 5334638,

at *22 (concluding that customer lists naming hundreds of customers were likely generated using Allstate's confidential information). But Allstate has identified only 35 individuals whom it says Freeman solicited, the majority of whom are Freeman's family and friends.[1] Dkt. 57, ¶¶ 104, 106, 115–85. No reasonable jury could infer that Freeman must have used Allstate's confidential information to contact such a small group of people, particularly given Freeman's undisputed personal relationship with most of them.

Finally, Allstate argues that a reasonable jury could infer misappropriation from Freeman's behavior at the Beaulieu Agency. Specifically, Allstate says that Freeman frequently brought her laptop home or was alone in the office and that she cleaned out her office of papers and personal effects the day before submitting her resignation. But Allstate doesn't say that it was unusual for insurance agents at the Beaulieu Agency to work from home or work in the office alone, nor does it explain why it would be unusual for an employee on the brink of resigning to clean out her office.

The bottom line is that Allstate has not adduced evidence that would allow a reasonable jury to infer that Freeman took any information that would qualify for trade secret protection. The court will grant Freeman's motion for summary judgment on the misappropriation of trade secrets claims.

### 2. Breach of contract

Allstate asserts that Freeman breached her confidentiality and non-competition agreement with Allstate in three different ways. First, it says that Freeman disclosed Allstate's

---

[1] In discovery, Freeman produced a list of her customers at the Schmick Agency, which Allstate compared to its customer lists, revealing 58 overlapping names. Dkt. 57, ¶ 198. But Allstate only contends that Freeman solicited 35 of these customers; it concedes that the other 23 switched on their own.

confidential information and used that information for her own personal benefit. Second, it says that she solicited Allstate's customers. And third, it says that she sold insurance from an office that was less than a mile from the Beaulieu Agency.

The parties agree that Allstate's breach of contract claims are governed by Wisconsin law. The court begins with the confidentiality agreement.

### a. Confidentiality

Freeman's confidentiality agreement with Allstate provided that she would not "disclose to any third party" or "use . . . for her own benefit" any of Allstate's confidential information. Dkt. 31-1, ¶ 4–6. The agreement defines confidential information broadly. The contract definition is:

> Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

*Id.* ¶ 3. Allstate says that Freeman violated her confidentiality agreement by saving customer information on her personal cellphone and by taking her handwritten notes and printed customer lists home with her and using them to build her insurance business at the Schmick Agency.

Allstate's breach of contract claim based on the confidentiality claim fails for the same reason as its trade secret claims. The parties agree that broad confidentiality provisions like

this one that lack geographic or time limit restraints are unenforceable under Wisconsin law unless the confidential customer information qualifies as a trade secret. *See* Dkt. 42 (Allstate's opposition brief), at 25 (citing *Nalco Chem. Co. v. Hydro Techs., Inc.*, 984 F.2d 801, 803 (7th Cir. 1993) and citing *Gary Van Zeeland Talent*, 84 Wis.2d at 218). As explained above, Allstate has not adduced evidence sufficient for a reasonable jury to determine that Freeman took or used any confidential information that would qualify as a trade secret. The agreement is unenforceable as to any information that is not a trade secret, so Freeman is entitled to summary judgment on the breach of contract claim based on the confidentiality agreement.

### b. Non-solicitation

Freeman's confidentiality and non-competition agreement also included a non-solicitation provision, which required her not to "solicit the purchase of products or services in competition with those sold by" Allstate to any of the following people:

- Any person, company, or organization to whom the Beaulieu Agency sold insurance or other products or services on behalf of Allstate and who was a customer of Allstate at the time of the termination.

- Any person, company, or organization who was a customer of Allstate at the time of the termination and whose identity was discovered as a result of access to Allstate's confidential information.

Dkt. 31-1, ¶ 7. The non-solicitation provision applied "for a period of one year following the termination of [Freeman's] employment by [the Beaulieu Agency]." *Id.* Allstate asserts that Freeman violated this provision by soliciting at least 35 customers of the Beaulieu Agency during the year following her resignation.

Freeman contends that summary judgment is warranted on Allstate's claim based on breach of the non-solicitation provision for two reasons. First, she argues that the non-solicitation agreement applies only when an agent is terminated by the Beaulieu Agency,

13

not when an agent resigns. Second, she says that Allstate hasn't provided any evidence that she actually violated the non-solicitation provision. The second reason is dispositive, so the court will grant Freeman's motion on that basis without considering the first reason.

Allstate contends that Freeman violated the non-solicitation agreement in two ways: (1) by offering to provide insurance quotes to Allstate customers; and (2) by posting general advertisements for her insurance services on Facebook. Freeman contends that both of these activities are outside the scope of the non-solicitation agreement. She says that she waited for Allstate customers to reach out to her first before she provided any quotes; as for the Facebook messages, she says that these were general advertisements, not targeted solicitations of Allstate customers.

The parties' dispute whether Freeman violated the non-solicitation agreement involves a question of contract interpretation. The goal of contract interpretation is to give effect to the parties' intent, as expressed in the contractual language. *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 22, 326 Wis. 2d 300, 786 N.W.2d 15. The court begins with the plain or ordinary meaning of the contract language, interpreting it in a manner consistent with "what a reasonable person would understand the words to mean under the circumstances." *MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr.*, 2015 WI 49, ¶ 37, 362 Wis. 2d 258, 864 N.W.2d 83. The court must afford contract terms "common sense and realistic meaning" in light of the context of the transaction. *Id.* (quoting *Betz v. Diamond Jim's Auto Sales*, 2014 WI 66, ¶ 68, 355 Wis.2d 301, 849 N.W.2d 292) (internal quotations omitted). If the contract's plain meaning is unambiguous when read in context, then the court ends there without considering extrinsic evidence of intent. *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, 716 N.W.2d 807.

14

In addition to general principles of contract interpretation, additional canons of construction apply to restrictive covenants that purport to restrain competition and trade, including non-solicitation agreements. *Manitowoc Co. v. Lanning*, 2016 WI App 72, ¶¶ 11–12, 371 Wis. 2d 696, 885 N.W.2d 798, *aff'd*, 2018 WI 6, 379 Wis. 2d 189, 906 N.W.2d 130 (citing Wis. Stat. § 103.465). These types of agreements are disfavored under Wisconsin law, so courts apply the following rules in interpreting them: "(1) they are prima facie suspect; (2) they must withstand close scrutiny to pass legal muster as being reasonable; (3) they will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires; and (4) they are to be construed in favor of the employee." *H & R Block E. Enters., Inc. v. Swenson*, 2008 WI App 3, ¶ 14, 307 Wis. 2d 390, 400, 745 N.W.2d 421, 426.

In this case, the key question is whether Freeman violated her agreement not to "solicit" Allstate's customers by providing her new business information and agreeing to provide quotes to Allstate customers who contacted her first. Neither party cites any Wisconsin authority on whether a former employee can "solicit" a customer if she did not initiate the contact, nor did the court discover any in its own research. Other states are split on the issue. *Compare Mona Elec. Grp., Inc. v. Truland Serv. Corp.*, 56 F. App'x 108, 110 (4th Cir. 2003) (solicitation requires initiation of contact under Maryland law); *Prudential Locations, LLC v. Gagnon*, 151 Haw. 136, 509 P.3d 1099 (2022), as amended (Apr. 1, 2022) (same under Hawaii law) *with Medcor, Inc. v. Garcia*, No. 21 CV 2164, 2022 WL 124163 (N.D. Ill. Jan. 13, 2022) (initiation by the customer didn't bar finding of solicitation under Illinois law); *Sunbelt Rentals, Inc. v. Holley*, No. 3:21-cv-3241-N, 2022 WL 1049468 (N.D. Tex. Apr. 7, 2022) (same under Texas law); *United HealthCare Servs., Inc. v. Corzine*, No. 2:21-cv-319, 2021 WL 961217 (S.D. Ohio Mar. 15, 2021) (same under Delaware law).

15

In the absence of controlling Wisconsin precedent, the federal court must predict how the Wisconsin Supreme Court would decide the issue. *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803, 811 (7th Cir. 2018). The plain meaning of "solicit" is ambiguous as to whether the solicitor must actively initiate contact. Some definitions support Allstate's position that a solicitation is anything done for the purpose of obtaining a customer's business, regardless of who initiates the contact. *Solicit*, New Oxford American Dictionary 1613 (2d ed. 2005) ("to ask for or try to obtain (something) from someone"). But other definitions support Freeman's position that solicitations are limited to inducements initiated by the solicitor. *Solicit*, Webster's Third Int'l Dictionary 2169 (2002) ("to approach with a request or plea").

The tiebreaker is Wisconsin's rule that restrictive covenants should be construed no further than the language of the contract absolutely requires. *H & R Block*, 2008 WI App, ¶ 14. In light of that rule, the court concludes that the Wisconsin Supreme Court would likely take the view that the employee must actively initiate contact in order to violate a non-solicitation agreement like Allstate's. Any other interpretation risks penalizing employees for good-faith business activities made simply because the employee misunderstood the scope of the agreement. *Cf. H & R Block*, 2008 WI App 3, ¶ 20 (restrictive covenant that results in "outcomes the employee cannot predict" is unreasonable). Some evidence suggests that that's what happened here. Freeman told several customers after they contacted her that she couldn't reach out to anyone on her own, but that she could talk to them after they reached out to her, suggesting that she understood her agreement to bar only conversations that she actively initiated. *E.g.,* Dkt. 45-17; Dkt. 45-11; Dkt. 45-9.

That leaves the question whether a reasonable jury could find that Freeman actively initiated contact with former Allstate customers about purchasing insurance services. In its

brief, Allstate says that Freeman "contacted several Allstate customers . . . offering to re-quote or 'shop' their insurance" and that when customers contacted her, she "would send her new insurance business email address, ask for their personal information, or set up a phone call—regardless of whether they were asking for her to place their business elsewhere." Dkt. 42, at 30–31. But to support these assertions, Allstate simply refers generally to the conversations that Freeman had with all 35 customers Allstate says that she solicited, without distinguishing between those that it admits initiated contact with Freeman and those with whom Freeman may have initiated contact. *Id.* Freeman disputes that she initiated contact with any of these customers, and Allstate fails to develop an argument to the contrary other than gesturing generally at essentially all the evidence in the record. The records related to these conversations are voluminous, and it is not the district court's job to sift through them to make Allstate's case for it. *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir. 2010). Allstate's argument that Freeman initiated conversations with customers is undeveloped, so it is forfeited.

Allstate also argues that Freeman's Facebook posts advertising her insurance services were solicitations, because Freeman was friends with several Allstate customers on Facebook, so these customers would have seen these advertisements. The court disagrees that these posts were solicitations under Freeman's non-competition agreement. The agreement prohibited only solicitations "with respect to any person, company, or organization" to whom the Beaulieu Agency had sold services or whose identity Freeman had discovered as a result of access to Allstate's confidential information. Dkt. 35-1, ¶ 7. That limitation suggests that general, non-targeted advertisements, such as Freeman's Facebook posts, were not barred. Even if some

of Allstate's customers saw the messages, they weren't solicitations "with respect to" those individuals; they were general advertisements applicable to everyone.

Allstate cites *Mobile Mini, Inc. v. Vevea* for the proposition that social media posts can sometimes be targeted solicitations, but that case isn't instructive, for two reasons. No. cv 17-1684, 2017 WL 3172712 (D. Minn. July 25, 2017). First, *Mobile Mini* relies on Delaware law, which takes a more favorable view of restrictive covenants than Wisconsin law does. *See Research & Trading Corp. v. Pfuhl*, Civ. A. No. 12527, 1992 WL 345465, at *6 (Del. Ch. Nov. 18, 1992) (no requirement under Delaware law to construe restrictive covenants narrowly). And second, *Mobile Mini* involved a post on LinkedIn, a social media platform more specifically targeted toward work-related contacts than Facebook. The court noted that the defendant had used LinkedIn as a marketing tool during her time with Mobile Mini, so her LinkedIn contacts likely included many Mobile Mini customers. *Mobile Mini¸* 2017 WL 3172712, at *6. Here, although Freeman may have been Facebook friends with some of her Allstate customers, nothing in the record suggests that her Facebook friends were not overwhelmingly her friends and family. A company's interest in prohibiting advertisements to an employee's friends and family is much weaker than its interest in prohibiting advertisements on a platform that the employee has specifically used to connect with customers on its behalf.

### c.  Office location

Freeman's non-solicitation agreement also prohibited her from selling insurance products "[f]rom any office or business site located within one mile of any locations from which [Freeman] solicited or sold Company insurance or other products or services during the year immediately preceding the termination." Dkt. 35-1, ¶ 7.3. Allstate asserts in its opposition brief that Freeman violated this part of the agreement because the Schmick Agency had an office in

Oshkosh less than half a mile from the Beaulieu Agency. Freeman didn't raise the office location issue until her reply brief, so the court would normally deem the issue forfeited. But Allstate moved for leave to file a surreply to address this issue, Dkt. 60, so the court will grant that motion and consider Freeman's arguments on the merits.

The court will grant summary judgment to Freeman on the breach of contract claim based on the Oshkosh office. Allstate relies on the declaration of Dawn Beaulieu, who explained that she did a Google Maps search and located a Schmick Agency office one-half mile from the Beaulieu Agency. Dkt. 45-3, ¶ 26. But Dawn's declaration establishes at most that the Schmick Agency had an Oshkosh location, which isn't enough to create a genuine dispute as to whether Freeman violated her agreement. The agreement doesn't bar Freeman from working for a company that has an office within a mile of the Beaulieu Agency; it only bars Freeman from selling insurance from that office.  Freeman explains in her reply brief that the Oshkosh office was a meeting room that her business partner Justin Schmick paid for personally and which she never used. Dkt. 58, ¶ 23. No reasonable jury could disbelieve Freeman's explanation based solely on Allstate's Google Maps evidence that the Schmick Agency had an Oshkosh office, so Allstate has failed to create a triable issue on the office location issue as well.

### 3.  Tortious interference with contract

Allstate contends that Freeman tortiously interfered with its contracts with customers by "wrongfully retaining Allstate customer and policy information and using that information to divert Allstate customers to her insurance business." Dkt. 42, at 32. A claim for tortious interference with contract under Wisconsin law has the following elements: (1) the plaintiff had a prospective contractual relationship with a third party; (2) the defendant interfered with that relationship; (3) the interference was intentional; (4) a causal connection exists between

the interference and the damages; and (5) the defendant was not justified or privileged to interfere. *Duct-O-Wire Co. v. U.S. Crane, Inc.*, 31 F.3d 506, 509 (7th Cir. 1994).

Freeman contends that Allstate's tortious interference claim fails on the fifth element, because Freeman is a legitimate competitor of Allstate and is therefore privileged to interfere with its contracts as long as it doesn't do so improperly. Wisconsin courts have adopted the Restatement (Second) of Torts § 768, which holds that a competitor is liable for tortious interference only if it uses improper means to induce a third party to terminate its contracts with the plaintiff. *Pure Milk Prods. Co-op. v. Nat'l Farmers Org.*, 64 Wis. 2d 241, 260, 219 N.W.2d 564 (1974). In its response, Allstate does not dispute that Freeman is a competitor and would not be liable unless she used improper means to interfere. Instead, Allstate contends that Freeman did use improper means, because she induced Allstate's customers to switch their policies by using Allstate's confidential information, including notes, printouts, and personal cellphone numbers that Freeman had saved in her phone.

The court concludes that based on the undisputed facts, no reasonable jury could infer that Freeman used Allstate's confidential information to induce customers to switch their policies. As the court explained in its discussion of Allstate's misappropriation of trade secrets claim, Allstate hasn't adduced any evidence sufficient for a reasonable jury to infer that Freeman took printed information or notes containing confidential information with her when she resigned. Allstate has some evidence that Freeman retained customers' cell phone numbers, but nothing in the record suggests that Freeman used those numbers to contact any Allstate customers after she resigned. As the court explained in the previous section, Allstate has not developed any argument contradicting Freeman's assertion that she waited for customers to

20

contact her, so any customers who switched policies couldn't have done so because Freeman retained their cellphone numbers after leaving Allstate.

### 4. Replevin

Allstate's final claim is a replevin action for return of Allstate's confidential information. To succeed on a replevin claim, plaintiff must show: (1) it is entitled to possession of the property involved; and (2) the property was unlawfully detained by the defendant. *Tyus v. Richmond*, No. 2023AP821, 2025 WL 935102 (Wis. Ct. App. Mar. 25, 2025) (citing Wis. Stat. § 810.13(1)).

Allstate seeks the return of the notes and printouts in Freeman's possession that contain Allstate's confidential information, and of Freeman's personal cellphone containing Allstate's confidential information. But as explained above, Allstate has not adduced evidence sufficient for a reasonable jury to find that Freeman possessed printouts or notes containing confidential information. As for Freeman's phone, it is undisputed that the phone is Freeman's property. Allstate argues that it is entitled to possession of certain *information* inside the phone, but as this court has previously observed, Wisconsin courts have not adopted the view that intangible property, such as information stored in a phone, can be the subject of a conversion or replevin action. *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-cv-748-wmc, 2016 WL 4033276, at *27–28 (W.D. Wis. July 27, 2016). Allstate has not established a genuine dispute as to whether Freeman unlawfully detained any tangible property to which Allstate is entitled, so the court will grant Freeman's motion for summary judgment on the replevin claim as well.

## B. Sanctions

Freeman has moved for sanctions under Federal Rule of Civil Procedure 11, contending that Allstate's arguments in support of each of its claims are legally and factually frivolous.

*See Royce v. Michael R. Needle P.C.*, 950 F.3d 939, 957 (7th Cir. 2020) ("The rule is principally designed to prevent baseless filings." (internal quotation marks omitted)). Under Rule 11, the district court may impose sanctions if a lawsuit is 'not well grounded in fact and is not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.'" *CUNA Mut. Ins. Soc'y v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 560 (7th Cir. 2006) (quoting *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 963 (7th Cir. 1993)). The court considers whether the accused attorney or party should have known, objectively, that his claims were groundless. *Id.*

The court will grant Freeman's motion in part. The motion will be denied for Allstate's claim that Freeman violated her solicitation agreement because Allstate had at least an arguable legal and factual basis for that claim. As the court explained in its ruling on the motion for summary judgment, there is no controlling Wisconsin precedent on the issue whether an employee violates a non-solicitation agreement if she pursues a former customer's business only after that customer initiates contact. Allstate had evidence that Freeman pursued former customers who contacted her, and it had a good-faith argument that that conduct violated her non-solicitation agreement.

Most of Allstate's remaining claims were based on its contention that Freeman had taken and used its confidential information.[2] The court concludes that Allstate violated Rule 11(b)(3) for these claims, so it will grant Freeman's motion. Put simply, Allstate had no

---

[2] Allstate's breach of contract claim based on Freeman's office location was not based on this contention. Freeman does not contend in her motion that Allstate's claim based on the office location was frivolous. A motion for sanctions under Rule 11 must "describe the specific conduct that allegedly violates Rule 11(b)," so the court will not award sanctions based on Allstate's pursuit of that claim.

reasonable factual basis to believe that Freeman had taken customer information with her other than a few contacts that she may have saved in her phone; even for these contacts, Allstate had no evidence that she used the contacts to pursue any of these individuals as customers. To support its assertion that Freeman took confidential information, Allstate relied entirely on the suspicions of Brett and Dawn Beaulieu, who admitted that they lacked personal knowledge of the content of Freeman's notes or what she might have printed and taken from the office. Dkt. 45-1 (Dawn Beaulieu Dep. 66:12–67:8; 91:13–94:13); Dkt. 36 (Beaulieu Agency 30(b)(6) Dep. 147:1–9).  At the very least, Allstate should have analyzed the computers and printers that Freeman used at work to determine what she may have downloaded or printed. Allstate is a sophisticated and well-resourced litigant with significant experience protecting its confidential information in court. *See* Dkt. 42, at 13–14 (Allstate's opposition brief to summary judgment, citing several trade secrets cases in which Allstate was the plaintiff).  It knows how to conduct a "reasonable and competent inquiry" into whether a former employee took its confidential information, which is what Rule 11(b)(3) requires. *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998).  Allstate's failure to do so here suggests that this case was a naked attempt to punish Freeman for not telling Allstate that she planned to join a competitor.

Allstate argues that Freeman's sanctions motion is premature because Freeman filed it before the court issued its ruling on summary judgment and because discovery is not yet complete.  Beyond a 21-day safe-harbor period, Rule 11 "does not specify any time period when a motion for sanctions must be filed, and we see no need to establish one." *Wrolstad v. CUNA Mut. Ins. Soc'y*, No. 15-CV-798-jdp, 2017 WL 3130438 (W.D. Wis. July 24, 2017) (quoting *Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1025 (7th Cir. 1999)). Allstate had its chance to present its case on summary judgment, and discovery closes in less than three weeks. Allstate

does not say what evidence it could discover in that time period that would make its claims non-frivolous, and in the context of Freeman's motion, what matters most is what basis Allstate had for its claims when it filed the case. The court sees no reason to conclude that Freeman's motion is premature.

The remaining question is the scope of the sanction. A district court may sanction a party, its counsel, or both for violations of Rule 11(b)(3), depending on who is "responsible for the violation." Fed. R. Civ. P. 11(c)(1). The court also has broad discretion to determine the appropriate sanction, but it must be limited to "what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." *Id.* 11(c)(4); *see also Divane v. Krull Elec. Co.*, 319 F.3d 307, 314 (7th Cir. 2003). In this case, the court will require Allstate to pay Freeman's reasonable attorney fees attributable to the sanctionable conduct. The court finds that Allstate is the responsible party: as explained above, Allstate is a particularly sophisticated litigant, so it should have been aware of the factual weakness of this case from the beginning. Fee-shifting is an appropriate sanction to deter repetition of this conduct. Requiring Allstate to pay Freeman's fees will deter Allstate from filing baseless lawsuits intended merely to discourage former employees from engaging in legitimate competition.

The court recognizes the difficulty of calculating attorney fees when the court has determined that fees are recoverable on only a portion of a party's claims. *See Divane*, 319 F.3d at 315–18. In this case, only the claims based on Allstate's assertion that Freeman took its confidential information were frivolous, so Freeman is entitled to her fees on only those claims. In *Divane*, the Seventh Circuit explained that courts can approach this issue by either allocating counsel's hours on a claim-by-claim basis, or, if the claims are too intertwined to reasonably do that, by reducing the overall fees by a reasonable percentage. *Id.* The court will give the parties

24

three weeks to confer and submit a joint stipulation as to the amount of the fee award. If the parties cannot agree on the appropriate amount, then Freeman should submit a fee petition along with a short brief explaining how the fees should be allocated to account for only the sanctionable conduct. Freeman should ensure that she complies with all of the court's requirements for fee petitions. *See* Standard Attachments for Civil Cases, Dkt. 10, at 39. Allstate will then have two weeks to respond to Freeman's petition.

ORDER

IT IS ORDERED that

1. Defendant Deanna Freeman's motion for summary judgment, Dkt. 27, is GRANTED.

2. Plaintiff Allstate Insurance Company's motion for leave to submit a surreply, Dkt. 60, is GRANTED.

3. Freeman's motion for sanctions, Dkt. 62, is GRANTED in part and DENIED in part. The motion is DENIED as to Allstate's claim for violation of the non-solicitation agreement and GRANTED for all of Allstate's claims based on its assertion that Freeman took its confidential information.

4. The parties have until January 28, 2026, to submit a joint stipulation on fees, or if the parties cannot agree, for Freeman to submit a fee petition. Allstate will have until February 11 to respond to the fee petition.

Entered January 7, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

25